**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 19-cv-474**

RICHARD D. HELMICK,

      Plaintiff,

v.

COLORADO DEPARTMENT OF TRANSPORTATION;
MICHAEL McVAUGH, in his individual capacity;
JASON BENALLY, in his individual capacity;
PAUL MARTINEZ, in his individual capacity; and
DARREL MAEZ, in his individual capacity.

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Richard D. Helmick, by and through his undersigned counsel, Mark A. Schwane, Schwane Law, LLC, hereby brings this action and for his Complaint and Jury Demand against Defendants Colorado Department of Transportation ("CDOT"), Michael McVaugh, Jason Benally, Darrel Maez and Paul Martinez, alleges the following:

**I. INTRODUCTION**

    1.  Beginning in April 2004, Plaintiff Richard D. Helmick was a Colorado state employee of Defendant Colorado Department of Transportation ("CDOT"), employed as a heavy equipment operator.  Plaintiff worked out of the CDOT facility in Saguache, Colorado.  On January 4, 2015, Plaintiff was violently assaulted by two persons with a baseball bat in Saguache.  As a result of the attack, Plaintiff suffered a significant skull

fracture and traumatic brain injury ("TBI"). Plaintiff was medevacked by helicopter and placed in the intensive care unit in a Denver hospital where he underwent brain surgeries over a period of eight days. Plaintiff was then admitted to Craig Hospital where he underwent approximately 30 days of in-patient rehabilitation that included physical, occupational, and speech therapy as well as behavioral health counseling. Plaintiff continued various therapies upon his release from Craig Hospital and was eventually able to return to employment with Defendant CDOT in his former position after medical evaluation and obtaining certification of for his commercial driver's license. While Plaintiff was able to perform the duties of his position, he suffered from memory impairments and delays in communicating with other persons that were a result of the TBI. Plaintiff's TBI impairments became the subject of harassment from co-workers. Co-workers would taunt him and push his buttons to see how he would react. Co-workers laughed at his disabilities. After an altercation with a co-workers in November 2015, Defendant CDOT ordered Plaintiff to undergo a behavioral risk assessment with a psychologist, who recommended that Plaintiff should undergo a neuropsychological evaluation to determine if his TBI impairments could be reasonably accommodated. Defendant CDOT and Defendant Benally ignored the assessment recommendation and subsequently imposed a disciplinary pay reduction on Plaintiff in January 2016, suspending him without pay for 30 days. In or about February 2017, Defendant Paul Martinez, a co-worker of Plaintiff's, made false allegations to Defendant Benally, claiming that Plaintiff had made veiled threats of violence. Defendant Benally sought confirmation of these veiled threats from Defendant Darrel Maez, another co-worker of

Plaintiff's. Though he initially denied the allegation, Defendant Maez subsequently provided responses that Defendant Benally determined was confirmation of the allegation of veiled threats.  Based on these statements, Defendant Benally recommended to Defendant Michael McVaugh that disciplinary action be taken against Plaintiff.  Plaintiff was then terminated form his position on March 13, 2017.  Plaintiff administratively appealed the termination and was reinstated to employment in October 2018.  However, Plaintiff continued to be the target of harassment from co-workers. Further, CDOT took no action against his co-workers to end the harassment.  Plaintiff suffered significant physical harm, economic harm, and emotional distress when he lost his health insurance from Defendant CDOT for a period of a 18 months of unemployment.  Further, he suffered severe emotional distress from the harassment both during his initial employment and after his return to employment.  Plaintiff, who was 61 years old at the time of his termination, had no job prospects in Saguache. Defendants Martinez and Maez, who worked on the same patrol as Plaintiff, deliberately participated in a concerted effort with Defendants Benally and Michael McVaugh to establish knowingly false claims of veiled threats of workplace violence against Plaintiff which were used to justify Plaintiff's termination from Defendant CDOT, in violation of his state constitutional due process rights.

## II.  PARTIES

2.  Plaintiff Richard D. Helmick is a resident of the State of Colorado and was a resident of the State of Colorado at the time his claims arose.

3.  Plaintiff was an employee of Defendant CDOT in Saguache, Colorado.

4.   Defendant CDOT is a state agency of the State of Colorado.  CDOT receives federal funding for the oversight and maintenance of state and federal highways and as such is subject to the Federal Rehabilitation Act of 1973 ("FRA"), 29 U.S.C. § 791, *et seq*.

5.   Defendant Michael McVaugh was the Regional Transportation Director for Region 5 for Defendant CDOT at the time these claims arouse and is a resident of the State of Colorado.

6.   Defendant Jason Benally was a Civil Rights Manager for Defendant CDOT at the time these claims arouse and is a resident of the State of Colorado.

7.   Defendant Darrel Maez was a maintenance employee for Defendant CDOT at the time these claims arouse and is a resident of the State of Colorado.

8.   Defendant Paul Martinez was a maintenance employee for Defendant CDOT at the time these claims arouse and is a resident of the State of Colorado.

### III.  JURISDICTION AND VENUE

9.   Jurisdiction in this Court is conferred pursuant to the Federal Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.*

10.  Jurisdiction is conferred pursuant to 42 U.S.C. §§ 1983 for violations of the Due Process clauses of the United States Constitution and Colorado state constitution.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), because the unlawful acts giving rise to Plaintiff's claims occurred within the jurisdiction of the United States District Court for the District of Colorado.

12. Plaintiff has complied with all administrative, jurisdictional and legal prerequisites to filing of this action.

## IV. GENERAL ALLEGATIONS

13. Plaintiff incorporates by reference all paragraphs of this Complainant as though fully alleged herein.

14. Plaintiff, attended high school in the San Luis Valley and had obtained his G.E.D., was first hired as a state employee by Defendant CDOT in April 2004 and was subsequently promoted to the classified as an Heavy Equipment Operator III ("EO III"). In this position, he was responsible for a wide range of road maintenance duties on state and federal roads, including mowing, paving, guardrail and roadside maintenance, snow plowing and other road maintenance and construction duties.

15. Plaintiff was assigned to Patrol 7, which operated out of the Saguache barn in CDOT Region 5.

16. Plaintiff's yearly performance evaluations showed that he meet or exceed expectations during his employment with Defendant CDOT.

17. On January 4, 2015, Plaintiff was violently assaulted outside of work by two persons with a baseball bat in Saguache, suffering a significant skull fracture. Plaintiff was medevacked by helicopter and placed in the intensive care unit in a Denver hospital where he underwent eight days of brain surgery. Further, he then underwent approximately 30 days of rehabilitation at Craig Hospital that included physical, occupational, speech therapy and behavioral health counseling. He continued various

therapies upon his return to Saguache, including physical, occupational, speech therapy and behavioral health counseling.

18. As a result of the assault, Plaintiff has a permanent traumatic brain injury. As a result of the TBI, Plaintiff has suffered from certain types of memory loss, expressive aphasia, challenges with problem solving and abstract reasoning skills, slowed rate of speech, and delays in his ability to socially interact and communicate with other persons.

19. During this period of medical treatment and rehabilitation, Plaintiff was placed on indefinite, unpaid administrative leave from Defendant CDOT after his sick and annual leave was exhausted.

20. On or about April 30, 2017, Defendant CDOT offered, and Plaintiff's primary care provider ("PCP") released him for, a temporary modified duty position performing various office duties. Plaintiff returned to employment on or about May 7, 2015.

21. On or about June 13, 2015, Plaintiff's PCP completed a fitness to return certificate and, based on his position description and duties, his PCP released him to work a full, regularly scheduled day with no restrictions. Further, Plaintiff obtained the necessary federally regulated medical certifications and again obtained his commercial driver's license.

22. Plaintiff was reassigned to his former patrol, Patrol 7, operating out of the Saguache barn. The lead worker for the patrol was Defendant Darrel Maez. The third employee on the patrol was Defendant Paul Martinez, a newly hired temporary

employee who began with CDOT in or about November 2014.  The patrol's immediate supervisor was Matt Wacker, who worked out of the Alamosa office.

23. Beginning in or about June 2015, Plaintiff began to experience conflicts in the workplace related to interactions with co-workers.  In particular, co-workers provoked and taunted Plaintiff to see, because of his delayed cognitive and social interaction impairments, if he would react to the antagonism.

24. In June 2015, Plaintiff got in an argument with Defendants Maez and Martinez when Defendant Maez ordered him to sit in the middle of a bench seat in a truck, between Maez and Martinez.  Plaintiff's refusal to do so was then reported to human resources staff with Defendant CDOT.

25. On or about July 7, 2015, Plaintiff and co-worker Kenny Lovato got in an argument when Lovato took control of a piece of heavy equipment that had been assigned to Plaintiff which he had been preparing for operation.

26. On or about November 10, 2015 Plaintiff was involved in an altercation with another co-worker.  Plaintiff and co-worker, Brian Velasquez, were exiting a CDOT building in Alamosa.  What initially was described as horseplay became an altercation between the two persons.  While eyewitness accounts differed, some co-workers claimed that Plaintiff had pushed Velasquez into a wall and others stated that Velasquez had pushed Plaintiff against the wall, holding him against the wall with one hand.

27. Defendant CDOT conducted an investigation pursuant to their Procedural Directive 10.1 and Policy Directive 10.0, Workplace Violence.  Pamela Martinez, a

human resources employee, participated in the investigation of the incident. In an email dated November 13, 2015 to Defendant Benally and other management, Ms. Martinez informed them of her findings:

> In my opinion, there was no apparent "threat". None of the participants or witnesses said they had ever felt threatened by Richard or felt afraid of Richard at any time. Everyone, except Richard, said they thought Richard and Brian were both playing until around the time Brian knocked Richard's hat off. At that point, Richard became visibly angry, and Brian walked away.

28. The incident report drafted by a supervisor, Ross Hamilton, indicated that the type of incident, which was not listed as a physical assault or threat, was identified as "Other: employees shoved each other back and forth."

29. Defendant Benally, in conjunction with the then Regional Transportation Director Kerrie Neet, ordered Plaintiff to undergo a behavioral risk assessment with a psychologist. The behavioral risk assessment was conducted on December 10, 2015 by Dr. Katherine McMann, Psy.D., in Denver. The assessment included reviewing documentation concerning Plaintiff that was provided by Defendant Benally as well as a clinical interview with Plaintiff, lasting approximately 1.5 hours.

30. Dr. McMann found that there was insufficient data to support that Helmick engaged in Proactive Attack Behaviors towards others.

31. Dr. McMann did make specific recommendations for follow up to Defendant CDOT, which included the following:

> Mr. Helmick should undergo a neuropsychological evaluation to determine the extent of the impact of his brain injury on work functioning. Additionally, the neuropsychological evaluation should provide recommendations for how Mr. Helmick can compensate for his deficits at work and any reasonable accommodations CDOT can provide for Mr. Helmick.

32. Defendant Benally and Dr. McMann also corresponded by email on December 16, 2015 concerning her draft assessment, which Defendant Benally and Neet were given to review.  In response to Benally's question as to why a physical altercation occurred, Dr. McMann stated:

> because the the [sic] evaluation is a behavioral risk assessment, it is impossible to determine the "why." However, I did list various hypotheses. A thorough neuropsychological assessment will help to narrow it down (specifically if he is perceiving things inaccurately, has poor short-term memory, decreased impulse control, etc.).

33. On January 6, 2016, Defendant Benally and Neet conducted a pre-disciplinary meeting with Plaintiff pursuant to state personnel rule.  On January 28th, Neet issued a disciplinary action, suspending Plaintiff without pay for 30 days.

34. Despite the finding in the Threat Incident Report by Hamilton and Ms. Martinez that Plaintiff had not engaged in a physical assault or threats and that the altercation began as mutual horseplay, as well as the behavioral risk assessment by Dr. McMann, Neet, in conjunction with Defendant Benally who acted as her representative and advisor in the matter, determined that Plaintiff had "yelled, threatened and physically pushed a co-worker" and that Plaintiff's actions had constituted "willful misconduct."

35. Velasquez received no corrective or disciplinary action as a result of his actions in the incident.

36. Defendant CDOT never sent Plaintiff for a neuropsychological evaluation pursuant to the recommendation of Dr. McMann.

37. Defendants CDOT and Benally never told Plaintiff about the recommendations made by Dr. McMann and never provided a copy of the behavioral risk assessment report to Plaintiff.

38. Defendant CDOT never conducted an interactive process with Plaintiff as related to the recommendations of Dr. McMann.

39. Plaintiff had no knowledge of the recommendations of Dr. McMann concerning the behavioral risk assessment or the possibility of reasonable accommodations.

40. However, on or about January 12, 2016, Ms. Martinez met with Plaintiff as part of what she described as an "interactive process." Ms. Martinez gave Plaintiff a copy of the CDOT "ADA Information Form." Plaintiff filled out the document to the best of his ability and returned it to Ms. Martinez. On the form, in response to questions that asked what type of accommodation was being requested and what specific tasks he needed assistance for, Plaintiff responded "none as of know [sic]." As to possible reassignment to an unfilled position, Plaintiff identified one position, a maintenance position that was held by a retiring worker in Alamosa.

41. No further action was taken by Ms. Martinez or Defendant CDOT in as a result of the meeting with Plaintiff.

42. Beginning on or about March 23, 2016, Plaintiff took his 30-day leave without pay. On April 11, 2016, Matt Wacker, Plaintiff's supervisor, emailed Defendant Michael McVaugh, the new Region 5 Transportation Director who replaced Neet, Wacker informed Defendant McVaugh of Plaintiff's TBI and related impairments and requested

that Defendant McVaugh reconsider the 30 day unpaid suspension because of financial hardship Plaintiff was experiencing. Wacker stated, in part:

> Richard [Plaintiff] had several issues between the time that he suffered a Traumatic Brain Injury, 1/2015 to the issue with Brian Velasquez. 10/2015. Richard gave me a book that was given to him when he was released from Craig Rehabilitation Hospital. The book says that the patient should expect to have times that they can't control their emotions. And times that they may lose control. These side effects should subside after 1 year of recovery.

43. Defendant McVaugh replied by email, acknowledging receipt of the information; however, he took no action in relation to Plaintiff, who completed the entire 30-day suspension.

44. On January 11, 2017, Ms. Martinez emailed Wacker, stating that Defendant Paul Martinez had come to her office "last month," after a December 12th meeting, telling her that he "does not feel comfortable around Richard [Plaintiff]" and that "he feels uneasy and does not ever know how Richard might react to something."

45. That same day, Wacker responded that he had spent part of the previous day working with Patrol 7. He stated Plaintiff seemed ok and that Defendant Martinez did not state anything was going on. Wacker stated he would check with everyone again and make sure all was well.

46. On February 16, 2017, Ms. Martinez emailed supervisor David Vialpando, asking "has Paul [Defendant Martinez] submitted his statement about the incident/comments made by Richard Helmick" to which Vialpondo replied, "I have not seen anything from him yet. I will reach out to him and see when he will send it to me."

47. CDOT Policy Directive 10.0 and Procedural Directive 10.1 provide guidance and requirements for the management and investigation of workplace violence allegations,

including threats of violence.  Directive 10.1 provides, in relevant part, that "all threats or acts of violence, whether received or observed . . . are to be reported immediately" to any supervisor, preferably in the chain of command.  Second, upon receipt of such a report, the "individual receiving the report will immediately inform the appropriate appointing authority" or designee, upon which the appointing authority should determine appropriate measure to be taken.  Personnel "receiving reports of threats or acts of violence must then complete a CDOT Threat/Violence Incident Report form 1277 immediately thereafter" which then "shall be submitted to the Manger of ER/L [Employee Relations/Legal] within three business days of each incident . . .."  Further, the Incident Report was to be updated and submitted again to the manager within three business days of making a disposition.

48. No CDOT Threat/Violence Incident Report form 1277 was completed by any employee of CDOT concerning the allegations from Defendant Martinez.

49. On or about February 17, 2017, Defendant Martinez sent an email to Vialpondo, in response to his solicitation.  In the email, Defendant Martinez stated that Plaintiff had made statements that led him to be worried that Plaintiff might be a threat of harm to them [Defendants Maez and Martinez]. Defendant Martinez claimed that Plaintiff stated that "he don't [sic] care if he spends the rest of his life in prison and that he would do the same amount of time if he kills one person as if he would kill ten people."

50. Defendant Martinez said that he hated it when Defendant Maez was not present at work because Plaintiff, who was the senior patrol worker when Defendant Maez was

absent, would yell at him and "he orders me about like I don't know what to do when in fact I always have to help him with work orders and any spelling or any paper work."

51. Defendant Martinez gave no dates when the alleged veiled threats of violence occurred, nor did he give a location where they were said. Defendant Martinez gave no context for the alleged veiled threats of violence.

52. Defendant Martinez also made claims of being "told off" by his supervisor, Matt Wacker.

53. On February 24th, Defendant Benally sent an email to Defendant Maez with an attached questionnaire asking eight questions seeking corroboration of Defendant Martinez claims of veiled threats made by Plaintiff. Defendant Benally stated he was "investigating" Plaintiff and needed Defendant Maez's responses to the questions as soon as possible.

54. Defendant Maez initially did not answer the questions and, on March 1, 2017, responded by email to Defendant Benally, stating the following:

> Jason [Defendant Benally], Responding to your Questions about Richard, Richard has had a brain injury about 2 years ago. I have witness [sic] him get mad at times, I talk to him then calm down [sic]. I went to school with him he was never like that back then. I feel people push his buttons so see [sic] how he responds. I feel he is not a treat [sic] to me.

55. On the same day, approximately 46 minute later, Defendant Benally replied to Defendant Maez and cc'd Defendant McVaugh, stating the following:

> Darrel, Please answer the questions as written in the document I have sent you. I need to remind you that not reporting or fully participating in a workplace violence investigation is not acceptable according to our workplace violence policy and procedural directives.

56. Defendant Benally then quoted language from Procedural Directive 10.1, stating that persons failing to report threats "may be subject to performance management review (i.e., considered in the employee's performance rating) and/or subject to corrective/disciplinary action." He then instructed Defendant Maez to make his response "a priority for this morning."

57. That same day, on March 1st, Defendant Maez responded to the eight questions in the memo. Of the eight questions, Defendant Maez responded with single word answers to six of the questions. The remainder were simplistic statements.

58. Some of Defendant Maez's answers were non-responsive. On one question, Defendant Benally asked, "when has Mr. Helmick made a direct or indirect or veiled threats while at work," to which Defendant Maez answered "yes."

59. Subsequently, Defendant Benally, in a memo he drafted, documented that Defendant Maez "was unable to provide sufficient details that would assist in determining a specific day or time that these events happened."

60. Further, Defendant Benally documented that Defendant Maez "stated that Mr. Helmick never directly threatened him."

61. Defendant Benally also sent a questionnaire to Wacker on February 23, 2017. Wacker outlined all of the efforts he had made to insure the patrol was working together and to make sure both Defendant Maez and Defendant Martinez knew to report any inappropriate behavior by Plaintiff, as well as conflicts on the patrol that had been reported to him and how he had resolved them. Wacker reported that no specific threats or veiled threats had been reported to him.

62. Neither Defendant Maez nor Defendant Martinez ever provided any context for the alleged comments.

63. Further, neither Defendant Maez nor Defendant Martinez provided any dates for when the comments were made, nor did they provide specific months.

64. Based on the information Defendant Benally had received, Defendants McVaugh and Benally sent a notice of pre-disciplinary meeting to Plaintiff. In it, they simply stated that there were reports that Plaintiff had made "indirect and veiled threats to physically harm another person."

65. Plaintiff attended the pre-disciplinary meeting with Matt Wacker as his representative. Defendant McVaugh and Defendant Benally never provided any of the statements or emails from Defendant Maez or Defendant Martinez prior to or at the meeting.

66. In the pre-disciplinary meeting, Defendant McVaugh questioned Plaintiff about the altercation he was in with Velazquez in 2016. In response to the questions about the 2016 incident, Plaintiff stated the following:

> One of the things with my brain injury is and I can show you in this book right here, causes me to say a lot of things that I don't necessarily mean to say and I can show you where it says that in this book that I got when I got out of the hospital. Whenever I get confronted with something a lot of trash stuff comes out of my mouth that I don't really mean to say and I'm working on getting that better but and I think I've come a long way.

67. The book Plaintiff referenced was entitled Traumatic Brain Injury Handbook, published by Craig Hospital. Plaintiff was referencing specific portions of the book that discussed social interaction impairments in persons with TBI.

68. Plaintiff offered to show the book to Defendant McVaugh and Defendant Benally, stating, "I can let you read all of that here when we get done."

69. Neither Defendant McVaugh nor Defendant Benally read the book offered by Plaintiff at or after the meeting.

70. Wacker asked Defendant Benally if he would share the allegations made and the source of the allegations. Defendant McVaugh responded, "I do have that information yes. That's fine Matt, but I don't want you to take over the meeting.. . . We can come back to that."

71. Later in the meeting, Wacker again asked for the allegations concerning veiled threats. Defendant Benally stated "I don't mind, I don't see a problem with providing the information. I think the information itself, it just confirms the report. I'd just like to say that."

72. Neither Defendant Benally nor Defendant McVaugh shared the statements in the meeting.

73. Wacker specifically asked the date when the threats were made. However, Defendant McVaugh changed the topic and did not answer. Instead, Defendant McVaugh paraphrased the allegations that were made against Plaintiff. Defendants Benally and McVaugh did not provide any dates of the allegations.

74. In the meeting, Plaintiff stated "one of the things that is going on ever since I got hurt is people . . . I don't know . . . people trying to get me in more trouble. I think that is where all these rumors came from now."

75. Neither Defendant Benally nor Defendant McVaugh took any action to investigate Plaintiff's claims of harassment by his co-workers.

76. Defendant McVaugh asked if there was anything Plaintiff wanted him to review. Plaintiff stated he brought his TBI Handbook, had marked pages 48 and 50 with sections he wanted them to read.  Defendant Benally interrupted and stated that Plaintiff should scan the handbook and then send them to him and Defendant McVaugh on a later date.

77. Neither Defendant Benally nor Defendant McVaugh conducted a review of Plaintiff's statements related to his TBI impairments and conducted no research into the issues of TBI impairments.

78. Despite Defendant Maez's email statement that people pushed Plaintiff's buttons and Plaintiff's statement about people trying to get him in trouble, neither Defendant McVaugh nor Defendant Benally conducted any investigation into the claims.

79. Defendant CDOT did no investigation into whether Plaintiff was being harassed because of his traumatic brain injury.

80. CDOT Procedural Directive 10.1, Workplace Violence, specifically states that CDOT employees are expected to adhere to certain provisions of the directive, including "understanding that false reporting is not tolerated by CDOT and employees who knowingly make false reports may be subject to corrective or disciplinary actions up to and including termination of employment."

81. Wacker stated in the meeting that he did not understand what was happening, stated that he felt this was "harassment" and again stated that this was why they need a copy of the documents supporting the allegations.

82. Defendant Benally asked if there was anything specifically upon which they should follow up. Wacker responded that they need to question Defendant Maez and Defendant Martinez.

83. When asked by Defendant McVaugh what they should follow up on with them, Wacker stated that they needed to specifically ask Defendant Maez and Defendant Martinez "where it happened, where they were at what time it happened."

84. Defendants McVaugh and Benally conducted no follow up after the pre-disciplinary meeting.

85. Plaintiff again brought up that maybe they were saying this because of his brain injury.

86. In the pre-disciplinary meeting, Plaintiff repeatedly denied making the comments as presented to him by Defendant McVaugh. Further, he denied threatening anyone at work, either directly or indirectly.

87. No employee of Defendant CDOT conducted any further follow up related to Plaintiff's request and the request of Matt Wacker.

88. Defendant Benally and Defendant McVaugh collaborated in drafting the disciplinary termination letter.

89. Despite having no information on when these alleged veiled threats occurred, Defendants McVaugh and Benally fabricated dates for the accusations. Specifically,

they stated that "in January 2017, you [Plaintiff] had said . . ." the statement that Plaintiff did not care about spending the remainder of his life in prison, regardless of how many persons he killed.  They wrote that Plaintiff stated, "in the last three months," Plaintiff stated the was willing to engage in fighting.  They wrote that "in November and December 2016" that Plaintiff made a threat of violence concerning a co-worker named Cory.

90. The letter provided no context for alleged statements.

91. Dated March 13, 2017, the letter terminated Plaintiff on that date for violations of Defendant CDOT's workplace violence policy.

92. Approximately a week after his termination, Defendant Martinez asked a supervisor how he could apply for a promotion into Plaintiff's vacant position.

93. In preparation for the hearing to deny Plaintiff unemployment benefits, Defendant CDOT employee Dorris Wangombe emailed Defendant Benally on or about March 29, 2017.  She stated, "Please answer these questions from Esther [the UI hearing representative for CDOT]. It says that in January 2017 the claimant made a comment about not caring if he spent the rest of his life in person [sic]......  Is this the final incident?  Was this comment directed to anyone?  I must have the date of the actual incident."

94. Defendant Benally responded, "Hi there, we were unable to confirm which date this actually happened.  All witnesses were unsure of the actual date."

95. Plaintiff was a classified state employee in the State of Colorado personnel system.

96. A central tenet of the Colorado state constitution, specifically Colo. Const. art. XII, §13(8) is that classified employees "within in the personnel system of the state shall hold their respective positions during efficient service or until reaching retirement age, as provided by law" and can be subjected to discharge or other discipline only for just cause.

97. Pursuant to Colorado state law and rule, Plaintiff administratively appealed his termination to the State Personnel Board.

98. Pursuant to the findings of the administrative law judge and the State Personnel Board, Plaintiff was returned to employment on or about October 1, 2018.

99. After the hearing, Defendant McVaugh approached Plaintiff and Plaintiff's son, Jarred Helmick, and apologized for how he had been treated by Defendant CDOT.

100. Defendant CDOT placed him in the same facility as Plaintiff had previously worked in Saguache.

101. While Plaintiff worked on a different patrol and was no longer on the same patrol with Defendant Maez and Defendant Martinez, Plaintiff still had weekly contact and interactions with them.

102. Almost immediately upon his return, Plaintiff was subject to harassment from Defendants Maez and Martinez. On or about October 13, 2018, Plaintiff had to take a tandem truck from Saguache to Alamosa. Plaintiff conducted the customary pre-

trip inspection on the truck, then went to the restroom while the air pressure built up in the brakes.

103.     Approximately 35 mile out from Saguache, a mud flap flew off the truck. Plaintiff stopped the truck, retrieved the mud flap, and returned to the truck to inspect it. Upon inspection, Plaintiff found that pins which held the mud flaps in place had been removed from the vehicle.  Plaintiff re-installed the mud flap and proceeded to Alamosa.

104.     Upon arriving at the headquarters in Alamosa, Plaintiff reported that he believed that his truck had been tampered with while he was in the restroom.  Plaintiff reported this to Ms. Martinez.  The matter was also brought to the attention of Defendant Benally with Plaintiff claiming that he believed Defendants Maez and/or Martinez had sabotaged his truck in retaliation.

105.     No investigation was conducted by Defendant CDOT or Defendant Benally.  Further, no action was taken in the matter by Defendants CDOT, Benally or McVaugh.  Plaintiff was then reassigned to another patrol.

106.     Upon information and belief, no corrective action was taken by Defendant CDOT against Defendants Maez or Martinez for the retaliation directed at Plaintiff.

107.     Upon information and belief, at no time was any action taken by Defendant CDOT against Defendants Maez and Martinez for their false reports against Plaintiff.

108.     Prior to his termination, Plaintiff had suffered from chronic colitis.  Plaintiff managed this condition with visits to his PCP and medications obtained through his employer health insurance plan.

109.     Upon his termination, Plaintiff lost his health insurance benefits from Defendant CDOT as a result of his termination from employment.

110.     Unable to afford health care insurance, Plaintiff applied for Medicaid in or about March and April 2018 upon his termination from employment.  Plaintiff was initially approved for the benefits.

111.     Plaintiff also applied for unemployment benefits, but was denied benefits on or about April 6, 2017 based on Defendant CDOT's claim that Plaintiff was terminated for violating a company rule.

112.     Plaintiff appealed the denial of unemployment benefits and, after two hearings in May 2017, the division reversed its decision and granted unemployment benefits in or about June 2017.

113.     However, based on the grant of unemployment benefits, Plaintiff was determined to be ineligible for Medicaid and was denied coverage.

114.     Plaintiff sought out and obtained some free care, as well as medication samples from medical providers.  However, this was only periodic in nature and eventually ended, leaving Plaintiff without medical care.

115.     Despite searching, Plaintiff was unable to obtain employment.

116.     His termination and inability to find other employment made Plaintiff feel useless.  The stress of being unemployed, worsening financial condition, and without medical care caused Plaintiff significant emotional distress.

117.     Further, his colitis condition worsened and contributed to his difficulties in finding employment because he experienced frequent and unexpected bowel movements which required that he remain close to a toilet.

118.     Having only obtained a G.E.D., Plaintiff's only work experience was working in agriculture in the San Luis Valley and having driven trucks for a living prior to being employed with Defendant CDOT.

119.     Plaintiff had been close to retirement, financially stable, and was close to getting his house mortgage paid off, all of which ended upon his termination.

120.     Plaintiff suffered extreme stress, did not want to be around anyone, and felt that his life had changed for the worse in a way that could not be reversed.

121.     Plaintiff borrowed money from family for expenses and relied on his son for support.  Plaintiff also refinanced his home in Saguache in or about September and October 2017.

122.     Unable to obtain medical care and pay for the cost of medications, as well as the stress of being terminated and unemployed, Plaintiff began to experience complications with his colitis.

123.     Plaintiff, who had served for a short period of time in the military and had been honorably discharged, was eventually able to obtain Veterans Administration benefits.

124.     However, Plaintiff's colitis became severe and he was hospitalized twice for the ulcerative colitis.

125.     The second hospitalization lasted approximately 18 days and included placement in the intensive care unit.  Doctors determined that his worsening ulcerative colitis, which had become a life-threatening condition, would require the removal of his colon in or about February 2018.

126.     The removal of the colon eventually stabilized Plaintiff.  However, Plaintiff was now required to use a colostomy bag for the remainder of his life.

127.     The colostomy bag, which is a permanent fixture in his life, is attached to Plaintiff's abdomen and collects waste which leaves his intestinal tract.  Plaintiff must remove the bag approximately four to five times per day to empty waste from his digestive tract.

128.     Plaintiff must be careful to maintain the bag and empty it on a regular basis as it can and has leaked.  Plaintiff keeps an extra bag with him at all times in case he does not have access to a restroom with running water.  Plaintiff has little control over how often it fills or when it will fill.

129.     Plaintiff can no longer eat raw vegetables, nuts, or other foods that are difficult to digest.

130.     Plaintiff is required to periodically go to the Veterans Administration medical providers in Denver to maintain his colostomy bag and his condition.

131.     Plaintiff's condition limits his ability to do activities, such as go on extended outdoor activities or other activities as he must remain close to a restroom and running water.  Plaintiff must also guard against the risk of infection.

132.     Plaintiff's ulcerative colitis and his permanent use of a colostomy bag are a result of the actions Defendants took against him to seek his termination from employment and will have permanent financial and emotional impact on him for the remainder of his life.

## V. LEGAL CLAIMS FOR RELIEF

### FIRST LEGAL CLAIM FOR RELIEF
### (Disability Discrimination, wrongful termination, in Violation of the Federal Rehabilitation Act, Against Defendant CDOT)

133.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

134.     Defendant CDOT is the recipient of federal funds to maintain roads in Colorado and is therefore subject to the provisions of the FRA, 29 U.S.C. §791, *et seq.*

135.     Because of Plaintiff's TBI, he suffers from permanent  disabilities that including short term memory loss, expressive aphasia, inability to perform routine mathematics, challenges with problem solving and reasoning skills, slowed rates of speech, challenges in regulating his behavior, and social interaction skills such as delayed responses to normal communications and interactions with other persons. Plaintiff's impairments are disabilities which substantially limit major life activities, including inability to manage personal financial matters, interactions and communications with other persons, caring for himself, thinking, reasoning and problem solving, and remembering.

136.     The essential functions of Plaintiff's Heavy Equipment Operator III position included operation of heavy equipment such as loaders, tandem dump trucks, sweepers

and other equipment used in road maintenance and snow removal, and other roadside maintenance including mowing, ditch maintenance, guardrail and sign maintenance.

137.     Plaintiff's TBI and related disabilities constitute a record of disability because of the nature and severity of the impairments which are permanent.

138.     Plaintiff is a qualified individual with a disability in that he is capable of performing the essential functions of his Heavy Equipment Operator III position with or without reasonable accommodations where he performed all of the duties of his position for approximately two years prior to his termination and continues to perform those duties upon his return to employment with Defendant CDOT.

139.     Because of Plaintiff's TBI and related disabilities, Defendant CDOT and its employees sought reasons to terminate him that had no basis in fact.

140.     After an altercation between Plaintiff and his co-worker in which both equally engaged in horseplay, Defendant CDOT place Plaintiff on 30 days of unpaid suspension upon learning from Dr. McMann, in her behavioral risk assessment, that his TBI and related impairments might constitute a disability warranting further inquiry into whether reasonable accommodations were appropriate.  Further, Defendant CDOT chose not to take any corrective or disciplinary action against Plaintiff's co-worker despite his equal participation in the altercation, showing its discriminatory animus against Plaintiff.

141.     Defendants CDOT, Benally and McVaugh all knew that Plaintiff suffered from a TBI and related disabilities and sought grounds to discipline and eventually

terminate Plaintiff from his position because they believed that his TBI related disabilities were bothersome and annoying to his co-workers.

142.	Defendant CDOT, through its employee Defendant McVaugh, knew Plaintiff had disabilities when it was informed by email from Matt Wacker in April 2016 and at the pre-disciplinary meeting in February 2017 that Plaintiff suffered from a TBI and had disabilities related to it.

143.	Defendant CDOT, through its employee Defendant Benally, knew Plaintiff had disabilities when it received Dr. McMann's behavioral risk assessment and in the pre-disciplinary meeting of February 2017 that Plaintiff suffered from a TBI and had disabilities related to it.

144.	Defendants CDOT, through its employee Defendant McVaugh, terminated Plaintiff from his position, despite having evidence that Defendant Maez's allegation that Plaintiff made veiled threats of violence were false.  The termination constituted an adverse action that harmed Plaintiff's livelihood and the basis for that termination was pretextual.

145.	Further, Defendants CDOT and McVaugh did so terminate Plaintiff because of his TBI and related disabilities, including difficulties in communicating with his co-workers, which they knew was a direct result of Plaintiff's TBI and related disabilities.

146.	As a result of the conduct and termination by Defendant CDOT as described hereinabove, Plaintiff suffered lost wages and compensatory damages, including emotional pain and suffering, and has incurred attorney's fees and costs.

**SECOND LEGAL CLAIM FOR RELIEF**
**(Disability Discrimination, failure to Conduct Interactive Process and**
**Provide Reasonable Accommodate in violation of the Federal**
**Rehabilitation Act Against Defendant CDOT)**

147.     Plaintiff incorporates by reference all paragraphs of this Complaint as
though fully alleged herein.

148.     Defendant CDOT, despite its knowledge of Plaintiff's TBI and his related
disabilities in communicating and interactions with other persons, ignored and withheld
information concerning possible reasonable accommodations for Plaintiff.

149.     Dr. McMann recommended to Defendant CDOT and Defendant Benally,
by email and in her behavioral risk assessment, that Plaintiff's TBI might be impacting
his interactions in the workplace and recommended that Plaintiff undergo a
neuropsychological evaluation to determine both the impact of the TBI on his work
functioning and whether any reasonable accommodations could be provided to Plaintiff.

150.     Despite its knowledge of these recommendations, Defendant CDOT
chose not to engage in a good faith interactive process related to the recommendation
of a neuropsychological evaluation as to Plaintiff's TBI and disabilities in interacting with
other persons at work.

151.     Further, Defendants CDOT and Benally intentionally did not to refer
Plaintiff for a neuropsychological evaluation to determine if reasonable accommodations
were necessary and appropriate.

152.     Defendant CDOT and Defendant Benally intentionally did not inform
Plaintiff of Dr. McMann's recommendation that he undergo a neurophysiological

evaluation. This knowledge would have allowed Plaintiff to further inquire into whether he could obtain reasonable accommodations related to his TBI and disabilities.

153.    Instead, Ms. Martinez simply had Plaintiff fill out a form requiring him to state whether he could do his duties.

154.    Defendant CDOT and Defendant Benally intentionally did not to give Plaintiff a copy of Dr. McMann's behavioral risk assessment report.

155.    Defendants Benally, McVaugh and CDOT knowingly ignored the information presented by Plaintiff in the pre-disciplinary meeting concerning his TBI and related disabilities.

156.    Defendants Benally, McVaugh and CDOT, in violation of CDOT Procedural Directive 602.1 "ADA Accommodation Procedures,"  intentionally failed to engage in an interactive processes and determinations as to whether reasonable accommodations were appropriate.

157.    Defendant CDOT intentionally failing to conduct a good faith interactive process so it could terminate Plaintiff from his employment.

**THIRD LEGAL CLAIM FOR RELIEF**
**(Disability Discrimination, Hostile Work Environment and Retaliation in Violation of the Federal Rehabilitation Act Against Defendant CDOT)**

158.    Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

159.    Defendants CDOT, Benally, and McVaugh, in violation of CDOT's own policy and procedural directives, failed to investigate the reports, that employees were

harassing Plaintiff and that Plaintiff worked in a hostile work environment, based on his TBI and related disabilities.

160.     Defendant CDOT, through its employee Defendant Benally, received information from Defendant Maez that Plaintiff's co-workers were intentionally "pushing his buttons" to see if he would react because of his diminished capacity related to his TBI.

161.     Defendant Benally ignored information and intentionally did not investigate the report of harassment, which would have made it more difficult to terminate Plaintiff.

162.     Defendant Benally ignored information from Plaintiff, provided in the pre-disciplinary meeting, that employees were harassing him to see if they could get him in trouble.  Neither Defendant Benally nor Defendant McVaugh took action to investigate the reports of harassment and did not take any action to end the harassment.

163.     This harassment by co-workers and the failure of Defendants CDOT, Benally and McVaugh to take any action to end the harassment resulted in a work environment for Plaintiff that was so severe and pervasive as to create a hostile work environment in violation of the FRA.

**FOURTH LEGAL CLAIM FOR RELIEF**
**(Violation of Substantive Due Process Interest Pursuant to 42 U.S.C. § 1983 Against Defendants McVaugh in his individual capacity, Defendant Benally in his individual capacity, Defendant Martinez in his individual capacity, and Defendant Maez in his individual capacity)**

164.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

165.     Plaintiff has a constitutionally protected property interest in his employment with the State of Colorado.  Colo. Const. Art. XII, §13(8) provides that "persons in the personnel system of the state shall hold their respective positions during efficient service or until reaching retirement age, as provided by law."  A central feature of the state personnel system is the principle that persons within the system can be subjected to discharge or other discipline only for just cause.

166.     Colo. Const. Art XII, §13(8) also provides that an employee certified to any class or position in the personnel system of the state may only be disciplined, including termination, by the appointing authority.

167.     Defendant McVaugh was the designated appointing authority for Plaintiff pursuant to state constitution and statute.

168.     Defendant McVaugh, as Plaintiff's appointing authority, acted under the color of state law when he terminated Plaintiff from his employment with the State of Colorado.

169.     Defendant McVaugh had a constitutional and statutory obligation to terminate Plaintiff only upon a showing of just cause.

170.     Defendant McVaugh was required under CDOT's Procedural Directive 10.1 and Policy Directive 10.0 to investigate, or authorize an investigation into, the claims of veiled threats of violence allegedly made by Plaintiff and to investigate the claims that Plaintiff was being harassed by co-workers because of his TBI and related disabilities.

171.     Defendant McVaugh had actual knowledge that the claims made by Defendant Martinez were not supported by any competent evidence.  In particular, Defendant McVaugh knew that no dates for the alleged veiled threats existed.  However, Defendant McVaugh, in coordination with Defendant Benally, wrote dates in the disciplinary termination letter that had never been provided by any employee and were false.

172.     Defendant McVaugh falsely stated in the disciplinary termination letter that Plaintiff did not provide any evidence to contradict his "supervisor's information."  Plaintiff's team leader, Defendant Maez, stated that he did not believe that Plaintiff was a threat in the workplace.  Defendant Maez, in his initial email statement to Defendant Benally, also failed to corroborate any of the claims of Defendant Martinez.

173.     Plaintiff clearly and repeatedly stated he did not make any veiled threat.  Further, Plaintiff's actual supervisior, Matt Wacker, who was also the supervisor for Defendants Maez and Martinez, clearly stated that he had no evidence of any veiled threat and that neither Defendant Maez nor Defendant Martinez ever reported to him any claim of veiled threats from Plaintiff.

174.     Defendant McVaugh was obligated to review all the information from Defendant Benally and any other source, which included Defendant Maez email statement that Plaintiff was not a threat and that Defendant Maez did not corroborate the allegations of veiled threats made by Defendant Martinez.

175.     Defendant McVaugh signed this disciplinary termination letter, representing that the information in the letter was accurate.

176.    Defendant McVaugh had actual knowledge that neither Defendant Benally nor any other employee of Defendant CDOT had conducted an investigation pursuant to the mandatory investigation requirements of CDOT Procedural Directive 10.1 and Policy Directive 10.0.  Defendant McVaugh was obligated to either conduct or authorize such an investigation.  Defendant CDOT's Procedural Directive 10.1 required investigations into these allegations of veiled threats and hostile work environment claims concerning Plaintiff and mandated the use of reporting for 1277.  No such investigation was ever conducted.

177.    Defendant McVaugh had actual knowledge that Plaintiff's TBI and related disabilities may be a reason Defendants Martinez and Maez were making the false allegations, but he disregarded this information when he terminated Plaintiff.

178.    Defendant McVaugh's intentional actions, in collaboration with Defendants Benally, Martinez and Maez, caused the deprivation of Plaintiff's substantive due process rights in his employment when he was termination from his position without case by Defendant McVaugh.

179.    Defendant Benally, as the Civil Rights Manager for Region 5, was empowered and required to conduct investigations into workplace violence claims, hostile work environment claims, and civil rights violations, pursuant to state and federal law, as well as the internal policies and procedures of Defendant CDOT.

180.    Defendant Benally, as the Civil Rights Manger for Region 5, was acting under the color of state law when he investigated the false allegations of workplace violence against Plaintiff, intentionally failed to provide Plaintiff with information about

his TBI impairments and possible reasonable accommodations, and intentionally failed to investigate claims that Plaintiff was subject to a hostile work environment because of his TBI and related disabilities.

181.    Defendant Benally had actual knowledge that CDOT procedural directive 10.1 and Policy Directive 10.0 required him to conduct an investigation and make a thorough report using form 1277, but he knowingly chose not to do so.  His failure to do so resulted in an factually inaccurate investigation based on false accusations, which was used to disciplinarily terminate Plaintiff from his employment with Defendant CDOT.

182.    Defendant Benally intentionally ignored Defendant Maez email response that Plaintiff was not a threat in the workplace and did not make veiled threats of violence.  Defendant Benally intentionally ignored Defendant Maez email statement that Plaintiff was subject to harassment by his co-workers because of Plaintiff's TBI and related impairments.

183.    Defendant Benally intentionally threatened Defendant Maez with possible corrective or disciplinary action in an effort to obtain corroboration for the false claims of Defendant Martinez that Plaintiff made veiled threats of violence.

184.    Defendant Benally had actual knowledge that Defendant Maez response to his questionnaire provide no substantiation for his determination that Plaintiff had made veiled threats of violence.

185.    Defendant Benally had actual knowledge that Defendants Martinez and Maez did not provide any dates or timeframes for the alleged veiled threats.  Defendant Benally had actual knowledge that Defendants Martinez and Maez provide no location

where the alleged threats were made. Defendant Benally had actual knowledge that Defendants' Martinez and Maez provide no context for the alleged veiled threats. However, Defendant Benally, in collaboration with Defendant McVaugh, knowingly wrote false dates of the threats in Plaintiff's termination letter and made further misrepresentations concerning the grounds for termination.

186.     Defendant Benally had actual knowledge that no other person had made a claim that Plaintiff was making veiled threats of violence. Further, Defendant Benally ignored information received form Matt Wacker that Defendants Martinez and Maez never reported any such claims to him.

187.     Defendant Benally had actual knowledge that the information he provided to Defendant McVaugh did not support the claims of Defendant Martinez, that Plaintiff had made veiled threats of violence, and that the information he did provide, in particular the dates of occurrence, were false.

188.     Defendant Benally had actual knowledge that Plaintiff might be entitled to reasonable accommodations because of Plaintiff's TBI impairments, but took no action to conduct an interactive process and never informed Plaintiff of the recommendations made by Dr. McMann.

189.     Despite Defendant Benally actual knowledge that Defendant Martinez claims were unsupported by any competent evidence, he recommended to Defendant McVaugh that Plaintiff be disciplinarily terminated from his position with Defendant CDOT.

190.     Defendant Benally had actual knowledge that the reason that Defendants Maez and Martinez presented false claims concerning Plaintiff was because they disliked working with Plaintiff and how he interacted with them as a result of the TBI related impairments.

191.     Defendant Benally had actual knowledge, based on the report from Plaintiff, that Defendants Maez and Martinez may have sabotaged Plaintiff's truck upon his return to employment, but took no action to investigation the matter.  Defendant Benally was under an obligation, as the Civil Rights Manager for Region 5, to conduct a formal investigation into Plaintiff's claims that his truck was sabotaged and that he was being retaliated against upon his return to employment.

192.     Defendant Benally's intentional actions, in collaboration with Defendants McVaugh, Martinez and Maez, caused the deprivation of Plaintiff's substantive due process rights in his employment when he was termination from his position without cause.

193.     Defendant Martinez was acting under the color of state law, in particular CDOT Procedural Directive 10.1, Policy Directive 10.0, state law, and Executive Order D 023 09 upon which the directives are based, when he made false allegations about Plaintiff.

194.     Defendant Martinez had actual knowledge that his false claims would result in the termination of Plaintiff for violations of Defendant CDOT's Workplace Violence directives.  In particular, Defendant Martinez admitted that the veiled threat

allegedly made by Plaintiff concerning fighting was only a discussion about the fights they got into when they were boys growing up in the San Luis Valley in Colorado.

195.     Defendant Martinez knowingly made false claims to Defendant Benally that Plaintiff had made veiled threats of violence in the workplace to him.

196.     Defendants Benally and Martinez acted in concert to effectuate the termination of Plaintiff based on false claims of veiled threats.  Both Defendants had actual knowledge of Plaintiff's previous disciplinary action and that the false claims would constitute grounds for disciplinary termination, resulting in violation of Plaintiff's substantive due process rights in his employment with the state.

197.     Defendant Martinez further showed his motive when he sought promotion into Plaintiff's vacant position shortly after his termination.

198.     Defendants Benally and Martinez shared the common goal of seeking Plaintiff's termination from his employment where no cause to terminate existed, in violation of Plaintiff's substantive due process rights.

199.     Defendant Maez was acting under the color of state law, in particular CDOT Procedural Directive 10.1, Policy Directive 10.0, state law, and Executive Order D 023 09 upon which the directives are based, when he provided false answers in response to Defendant Benally's investigation into the claims of Defendant Martinez.

200.     Defendant Maez had actual knowledge that Plaintiff had not made veiled threats of violence and told this to Defendant Benally.  However, Defendant Maez knowingly provided false answer to Defendant Benally when he was threatened to answer the questionnaire.

201.     Defendants Benally and Maez acted in concert to effectuate the termination of Plaintiff based on false claims of veiled threats.  Both defendants had actual knowledge of Plaintiff's previous disciplinary action and that the false claims would constitute grounds for disciplinary termination, resulting in violation of Plaintiff's substantive due process rights.

202.     Defendants Martinez and Maez acted in concert to sabotage Plaintiff's truck by removing pins from the mud flats in an attempt to jeopardize his employment and cause harm to him personally as a result of the accident when Plaintiff returned to employment with Defendant CDOT.

203.     The concerted conduct of Defendants McVaugh, Benally, Martinez and Maez violated the established rights of the Plaintiff, of which reasonable persons in Defendants' position should have known.

**FIFTH LEGAL CLAIM FOR RELIEF**
**(Violation of Procedural Due Process Interest Pursuant to 42 U.S.C. § 1983 Against Defendants McVaugh and Benally, in their individual capacities)**

204.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

205.     Defendants McVaugh and Benally were acting under the color of state law when they conducted the pre-disciplinary meeting with Plaintiff, pursuant to state constitution, statute and state personnel rule.

206.     Defendants McVaugh and Benally refused to share information with Plaintiff prior to and at the time of the pre-disciplinary meeting, which would have allowed Plaintiff to refute the claims.

207.     Defendants McVaugh and Benally, when conducting the pre-disciplinary meeting with Plaintiff, purposefully withheld information from Plaintiff that Defendant Maez had stated that he had not witnessed any threatening behavior from Plaintiff.

208.     Defendants McVaugh and Benally, when conducting the pre-disciplinary meeting with Plaintiff, purposefully paraphrased the alleged veiled threats and provided no details of the allegations, making it impossible for Plaintiff to defend himself against the allegations.

209.     Defendants McVaugh and Benally, when conducting the pre-disciplinary meeting with Plaintiff, knowingly and deliberately withheld information from Plaintiff concerning Defendant Martinez claims of veiled threats in violation of Colorado state personnel rule, which made it impossible for Plaintiff to specifically deny the allegations against him which were the basis of his termination.

210.     Defendants McVaugh and Benally, when conducting the pre-disciplinary meeting with Plaintiff, knowingly and deliberately withheld information from Plaintiff that they were unable to verify the date of any of the alleged veiled threats of violence claimed by Defendant Martinez.  Defendants also knowingly withheld information that Defendant Martinez could not provide a location where the statements were made nor could he provide any context for the claims.

211.     Defendants McVaugh and Benally knowingly withheld information that the only other employee who had provided information was Defendant Maez, who did not corroborate Defendant Martinez claims.

212.     Defendants McVaugh and Benally, when conducting the pre-disciplinary meeting with Plaintiff, knowingly and deliberately refused to review information offered by Plaintiff concerning his traumatic brain injury which was relevant to his explanation of his disabilities and his interactions with co-workers.

213.     Defendants McVaugh and Benally failed to send Plaintiff a timely notice of his pre-disciplinary meeting pursuant to Colorado state personnel rule making it difficult for Plaintiff to defend himself.  The short notice, in combination with the withholding of information by Defendants McVaugh and Benally from Plaintiff, deprived Plaintiff from being able to effectively defend himself, in particular where his traumatic brain injury and related impairments limited his ability to communicate effectively in his defense.

214.     Defendants McVaugh and Benally determined prior to the pre-disciplinary meeting with Plaintiff that he had made the alleged veiled threats and would be terminated pursuant to Defendant CDOT Workplace violence policy and procedure.

215.     The concerted conduct of Defendants McVaugh and Benally  violated Plaintiff's clearly established procedural due process rights in having notice of the substantive allegations against him and allowing him an opportunity to defend himself against the allegations.

**SIXTH LEGAL CLAIM FOR RELIEF**
**(Denial of Equal Protection Under the Law Pursuant to 42 U.S.C. § 1983**
**Against Defendants McVaugh and Benally, in their individual capacities)**

216.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

217.     Defendants McVaugh and Benally knew that Plaintiff suffered impairments because of his TBI and was disable as a result.

218.     Defendants McVaugh and Benally knew that CDOT Policy Directive 10.0 and Procedural Directive 10.1 required them to investigate false claims of workplace violence and that CDOT procedural and policy directives, as well as state and federal law, prohibited harassment of an employees based on his or her disability, or the perception of a disability.

219.     Despite knowledge that Plaintiff was the subject of harassment and potentially false allegations, Defendants McVaugh and Benally intentionally chose not to investigated the claims.

220.     Defendants McVaugh and Benally intentionally discriminated against Plaintiff who was in a protected class because of his disabilities.  They chose to apply CDOT's procedural and policy directives against Plaintiff in order to terminate him, but intentionally ignored those same directives when they were required to do so to protect Plaintiff's rights under law.

221.     Defendants McVaugh and Benally knowingly chose not to conduct a mandated Workplace Violence investigation into the false allegations of Defendant Martinez as prescribed by CDOT Policy Directive 10.0 and Procedural Directive 10.1 because such an investigation would have evidence that the alleged veiled threats of violence had not occurred.

222.    The concerted conduct of Defendants McVaugh and Benally, violated the established rights of the Plaintiff, of which reasonable persons in Defendants' position should have known.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Richard D. Helmick respectfully requests that this Court enter judgment in his favor and against Defendants and award the following:

a) Compensatory and consequential damages including for emotional distress;

b) Front pay and benefits and other lost wages to be determined at trial;

c) Punitive and exemplary damages as allowed for by law;

d) Reasonable attorney fees and costs as allowed by law;

e) Prospective relief in the form of injunctive and declaratory relief;

f) Pre- and post-judgement interest, costs and expert witness fees; and

g) Any such other relief as the Court deems just and proper.

**Plaintiff Richard D. Helmick requests a trial by jury on all issues so triable.**

Respectfully submitted this 18th February, 2019.

SCHWANE LAW, LLC

*s/ Mark A. Schwane*
Mark A. Schwane (CO #22677)
501 S Cherry St, 11th flr
Denver, CO  80246
Telephone: (303) 515-7135
Email: mark@schwanelaw.com

Plaintiff's Address
300 Pitkin Avenue
Saguache, CO 81149